

**FILED**
JUN 29 2010
PATRICK E. DUFFY, CLERK
By_____
DEPUTY CLERK, MISSOULA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | ) | CV 09-160-M-DWM |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | OPINION |
| PAUL BRADFORD, Supervisor of the | ) | |
| Kootenai National Forest, JANE | ) | |
| COTTRELL, Acting Regional Forester of | ) | |
| Region One of the U.S. Forest Service, | ) | |
| UNITED STATES FOREST SERVICE, an | ) | |
| agency of the U.S. Department of | ) | |
| Agriculture, and UNITED STATES FISH | ) | |
| & WILDLIFE SERVICE, an agency of the | ) | |
| U.S. Department of Interior, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

-1-

# I.  Introduction

Alliance for the Wild Rockies is seeking judicial review under the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, of agency actions

by the U.S. Forest Service and the U.S. Fish & Wildlife Service concerning the

Grizzly Vegetation and Transportation Management Project ("Grizzly Project"),

the Miller West Fisher Project ("Miller Project"), and the Little Beaver Hazardous

Fuels Reduction Project ("Little Beaver Project").  The Complaint claims the

agencies acted in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §

1533 et seq., the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600

et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321

et seq.  Pending now are the parties' cross-motions for summary judgment.  For

the reasons set forth below the motions are granted in part and denied in part.

## II.  Factual Background

### A.    The Cabinet-Yaak grizzly bear population

The grizzly was listed as a threatened species under the ESA in 1975.  40

Fed. Reg. 31736.  The Fish & Wildlife Service approved a Grizzly Bear Recovery

Plan in 1982 and then revised the Plan in 1993.  AR 1-31-077.[1]  The revised

---

[1] Citations to the Administrative Record are denoted as AR [disc number]-[volume number]-[document number]: [PDF page number].

recovery plan establishes four recovery zones, including the Cabinet-Yaak Ecosystem in northwest Montana and northeast Idaho, which is partly on the Kootenai National Forest. Id. at 90. Roughly 90% of the Cabinet-Yaak Ecosystem is federally owned. 64 Fed. Reg. 26725, 26728 (May 17, 1999). That recovery zone is divided into bear management units ("BMUs"), each of which approximates the size of a female grizzly's home range and includes representations of all available habitat components. Cabinet Resource Group v. U.S. Fish & Wildlife Serv., 465 F. Supp. 2d 1067, 1072 (D. Mont. 2006). The BMU's are then divided into subunits called bear analysis areas. AR 1-31-041:6.

The recovery goal for the Cabinet-Yaak grizzly bear population is 100 bears. AR 1-31-077:91. The 1993 Recovery Plan estimated the population size at 15-20 bears in the recovery zone. AR 1-31-077:92. By 2002, the Forest Service noted that the bear population had expanded outside the recovery zone. AR 2-3-104:3. By 2007, the estimated population of grizzly bears in the Cabinet-Yaak Ecosystem was 45 bears. AR 1-31-034.2:2. While the population has increased over the past 15-20 years, a different picture has appeared recently. The most recent grizzly population trend analysis shows an 87.8% to 90.6% probability that the population is in decline. Id. at 66. The Cabinet-Yaak grizzly bear population is not meeting recovery targets set forth in the 1993 Recovery Plan. For example,

-3-

the Recovery Plan's target for a six year average of females with cubs is 6, but the

2007 Monitoring Report found that the average was only 2.2, and the distribution

of females with young is only 14 of 22, rather than the recovery target 18 of 22.

AR 1-31-034.2:18. Additionally, human caused mortality and human-caused

mortality of females exceeded the Recovery Plan targets in the 2007 monitoring

report. Id. The majority of human caused mortalities in the Cabinet-Yaak grizzly

bear population do not occur on Forest Service Lands, but on other surrounding

lands. Id. at 73. Outside the recovery zone, the Forest Service does not analyze

bears using BMUs, but has categorized the areas used by bears as the "grizzly bear

outside the recovery zone reoccurring use polygon" ("reoccurring use polygon").

AR 2-1-713:10.

The 1993 Recovery Plan established that "the most crucial element in

grizzly recovery is securing adequate effective habitat for bear populations." AR

1-31-077:34. The plan also concluded that roads pose the "most imminent threat"

to grizzly bear habitat. Id.

The troubling mortality trends with the grizzly precipitated the Fish &

Wildlife Service determination that the Cabinet-Yaak grizzly population was so

low it warranted reclassification from threatened to endangered in 1993. The

Agency reaffirmed its finding in 1999. 64 Fed. Reg. 26725, 26733. The agency

has not acted on this critical determination, contending the reclassification is precluded by work on higher priority species.  Id.

**B.    Procedural background of grizzly management in the Cabinet-Yaak Ecosystem**

The 1987 Kootenai Forest Plan adopted forest-wide standards relating to management of the grizzly bear.  The Forest Plan requires that on "Management Situation 1 lands,[2] "Management decisions will favor the needs of the grizzly bear when grizzly habitat and other land use values compete.  Land uses which can affect grizzlies and/or their habitats will be made compatible with grizzly needs or such uses will be disallowed of eliminated."  AR 1-19-004:293.  On Management Situation 2 lands, where grizzles may occasionally be present, "[t]he grizzly bear is an important, but not the primary, use on the area."  Id.  Management Situation 3 lands are those where grizzly bear presence is possible but infrequent and grizzly "habitat maintenance and improvement are not management considerations."  The Forest Plan also set standards for, among other factors, average open road densities, which must be limited to .75 miles/square mile on Management Situation 1 and 2 lands.  Id. at 301.

The 1994 Interagency Grizzly Bear Taskforce authored a Report with goals

---

[2] Management Situation 1 lands contain "grizzly population centers . . . and habitat components needed for the survival and recovery of the species."  AR 1-19-004:292.

and recommendations for parameters relating to the effects of motorized access on

bears. AR 2-3-096. That Report urged analysis of total motorized route density,

open motorized route density, and percentage of core area. Id. at 6. The first

factor, total motorized route density, includes all motorized roads or trails,

including those closed to the public. The second factor, open motorized route

density, includes motorized roads and trails open to the public. Id. at 3. As to the

third factor, the Report recommended analysis of the percentage of an analysis

area that meets core area criteria, and it argued for establishing minimum sizes for

core areas. Id. at 6.

The Service determined that the 1987 Kootenai Forest Plan could cause

"take" of the grizzly bears, a "take" which is prohibited under section 9 of the

ESA. AR 1-31-041:8. Consequently, in 1995, the Fish and Wildlife Service

published a Biological Opinion and Incidental Take Statement for the 1987

Kootenai Forest Plan ("1995 Incidental Take Statement"). AR 1-31-041. The

1995 Incidental Take Statement reaffirmed the finding in the Recovery Plan that

roads and road density "are among the most serious adverse impacts on the

security of grizzly bear habitat and have negatively influenced grizzly bear

population and habitat use patterns in numerous, widespread areas." Id. at 3. The

Take opinion then reviewed the recommendations in the Report by the 1994

Interagency Grizzly Bear Taskforce. Id.. In doing so the Incidental Take Statement found that road density standards in the Forest Plan were exceeded in many BMU subunits, the bear analysis areas, and that the Forest Plan did not provide management guidance for total road density and core habitat within BMUs, factors that are necessary for adequate bear habitat security. Id. at 6. The Service then concluded there would be no jeopardy to the Cabinet-Yaak grizzly bear population and authorized incidental take of grizzly bears, provided the Forest Service adopted reasonable and prudent measures set forth in the Take Statement. Id. at 9. These measures required the Forest Service to construct access management standards to regulate open road, open motorized trail route density, and total motorized access route density, and to maintain and improve core habitat areas. Id. at 9-10. The 1995 Incidental Take Statement promulgated interim standards that would govern until the Forest Service adopted the required measures. The interim standards included a requirement that the Forest Service must comply with the Forest Plan. That meant the Forest Service would exceed the authorized level of incidental take if a proposed project "increases the density of open roads above the current Forest Plan Standard, increases the density of open motorized trails, increases the net total motorized access route density, or decreases the existing amount of core area in the affected BMU's." Id. at 11.

The Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee issued the 1998 Interim Access Management Rule Set ("1998 Rule Set") to govern motorized access in the Selkirk and Cabinet-Yaak Ecosystems. AR 1-31-024. The interim 1998 Rule Set was limited in effect for a period of three years or until the applicable Forest Plans were revised. Id. at 1. It directed federal agencies to strive to provide a minimum of 70 percent habitat security (or habitat effectiveness) in each BMU, and to work to achieve 55 percent core habitat in Priority 1 BMUs, with "[n]o net loss" of core habitat in Priority 1, 2, and 3 BMUs. Id. at 2. The 1998 Rule Set also established a goal of "no net increase" in open motorized route density or total motorized route density on national forest lands within the recovery areas. Id. at 3. The Forest Service did not prepare a NEPA environmental analysis or undertake ESA consultation before adopting the 1998 Rule Set. Id. at 1. In a different lawsuit Plaintiff in this case sued the Kootenai and Idaho Panhandle National Forests for implementing the interim access rules without first amending their Forest Plans. Alliance for the Wild Rockies v. Bosworth, CV 00-13-M-DWM. The Forest Service settled the lawsuit in 2001 by agreeing to amend the Forest Plans to address grizzly bear habitat management and to consult with the Fish & Wildlife Service on the amendments. AR 4-1-005.

-8-

In March 2002, the Forest Service issued a Final Environmental Impact Statement ("EIS") on the amendment to the relevant Forest Plans (the "Access Amendments"). The Access Amendments relied on research known as the "Wakkinen study" identified as the best available science. The Wakkinen study used research data from radio-collared grizzly bears in the Selkirk and Cabinet-Yaak Ecosystems to help determine open and total road density and to help determine core habitat levels necessary to support the grizzly bear population.

In June 2002, the Forest Service asked for formal ESA consultation with the Fish & Wildlife Service on its preferred alternative for the Access Amendments. After a time, in February 2004, the Fish & Wildlife Service issued a Biological Opinion on the proposed Access Amendments. It found that implementation of the proposed amendments was not likely to jeopardize the continued existence of grizzly bears in the Cabinet-Yaak and Selkirk Ecosystem Recovery Zones. A short time later in March 2004, the Forest Service issued a Record of Decision adopting its preferred alternative, as modified by the incorporation of the terms imposed by the Biological Opinion.

In December 2006, this Court set aside the Final Environmental Impact Statement and Record of Decision for the Access Amendments. See Cabinet Resource, 465 F. Supp. 2d at 1101. The Record of Decision was set aside because

-9-

the Forest Service failed to acknowledge and discuss the relevance of missing information in the Wakkinen study as required by NEPA. Id. at 1098–1100. Specifically, the agency did not discuss whether the bears in the Wakkinen study chose optimal habitat or whether they simply chose the best habitat available from a degraded landscape. Id. at 1098–1101. The issue was remanded to the Forest Service for preparation of a new environmental analysis, which "must take into account the misgivings of Fish & Wildlife Service biologists over the 33/26/55 standard, the findings of other studies measuring habitat parameters in other ecosystems, and the state of grizzly bear mortality in the Cabinet-Yaak and Selkirk Recovery Zones." Id. at 1101. The Forest Service is currently in the process of conducting this new analysis, and a draft EIS on a second access amendment was issued in April 2009. AR 4-1-006.

After the remand, a Forest Service wildlife biologist set forth six recovery objectives (the "2006 interim rules") to be followed until the Forest Service adopted new Access Amendments AR 2-3-108. The standards are derived from the 1987 Kootenai National Forest Plan, Fish & Wildlife Service Consultations since 1987, the 1995 Amended Biological Opinion and Incidental Take Statement on the 1987 Kootenai National Forest Plan, and the Selkirk/Cabinet-Yaak Grizzly Bear Areas Interim Access Management Rule Set. Id. at 1. They require 70%

-10-

habitat effectiveness; open road density, determined at the BMU level, of less than .75 miles/square mile; no net increase in open motorized route density; no net increase in total motorized route density; and no net decrease in core area.[3] Id. The Forest Service claims that these standards do not apply in the areas outside the recovery zone. Id. at 2.

## C.   The Projects

### 1.   The Grizzly Project

The Grizzly Project is located on the Three Rivers Ranger District of the Kootenai National Forest, approximately 18 miles northeast of Troy, Montana. AR 1-33-001:17. The purposes of the project include vegetation restoration, road and trail management (in part to provide adequate grizzly bear habitat), watershed rehabilitation, fuels management, and timber production. Id. at 18.

The Forest Service completed an EIS for the project, and after comments to the proposed action, adopted a modified proposal, Alternative 2a, in the final EIS. AR 1-33-006:7. The chosen alternative permits 907 acres of harvest using tractor and skyline methods, but it does not allow helicopter logging. Id. at 14. It calls for constructing 3.2 miles of temporary road, of which 1.4 miles will be new and

---

[3]The road density and core habitat standards match with the standards set forth in the 1998 Rule Set.

1.8 reconstruction of already existing road. Id. The project requires permanent

decommissioning of 42.8 miles of road. Id. The road decommissioning is in areas

of core habitat and would provide linkage between two areas of core. AR 1-33-

005:120. The project is expected to last four to five years, with some follow-up

work. AR 1-32-004:8.

The Grizzly Project is located inside the recovery zone on portions of BMU

11 and BMU 14. Because the project is located in grizzly bear habitat, the Forest

Service prepared a biological assessment pursuant to § 7 of the ESA to determine

if the Project will affect grizzly bears. AR 1-32-004. The Biological Assessment

concluded timber harvest would temporarily affect 280 acres of core, but the

project requires the creation of 1,000 acres of replacement habitat by berming of

roads. There may also be temporary impacts on 2,290 acres within core habitat

during road decommissioning at the beginning of the project. AR 1-32-004:7. On

2,050 acres affected by road decommissioning, work would take place during an

eight week period in summer to avoid impacting bears from foraging in spring

habitat and to avoid impacting bears during the season when huckleberries are

available. Id. The Forest Service estimates that after the project, there will be

2,700 acres of additional core habitat in BMU 11. Id. at 6. While some of the

road decommissioning must be completed prior to project implementation, other

-12-

decommissioning will be done "when funding becomes available." AR 1-33-001:24041. The Forest Service states that funding is "likely" to be available, and decommissioning of roads for which funding is not guaranteed is not required to ensure compliance with the ESA. AR 1-34-012:5-6.

The impacts on grizzly bears were analyzed by applying the 2006 interim rules. Id. at 5; see AR 2-3-108. The chart below, taken from the biological assessment, summarizes the various habitat components before, during, and after the project in both BMU 11 and BMU 14:

| BMU | Habitat Component | Existing | During | Post |
|---|---|---|---|---|
| 11 | Habitat effectiveness (%); Std. ≥70% | 74% | 70-72% | 74% |
| | Linear open road density (miles/sq. mile); Std. ≤0.75 | 0.44 | 0.58-0.57 | 0.48 |
| | Core (% of BMU); Std. ≥55% | 52% | 52% | 56% |
| | Open motorized route density (% BMU ≥ 1 mi./sq.mi.); Std. ≤33% | 28% | 32-31% | 28% |
| | Total motorized route density (% BMU ≥ 2 mi./sq.mi.); Std. ≤26% | 29% | 29-27% | 25% |
| 14 | Habitat effectiveness (%); Std. ≥70% | 76% | 76% | 76% |
| | Linear open road density  (miles/sq. mile); Std. ≤0.75 | 0.57 | 0.58 | 0.57 |
| | Core (% of BMU); Std. ≥55% | 56% | 55% | 56% |
| | Open motorized route density  (% BMU ≥ 1 mi./sq.mi.); Std. ≤33% | 28% | 29% | 28% |
| | Total motorized route density (% BMU ≥ 2 mi./sq.mi.); Std. ≤26% | 26% | 26% | 2% |

AR 1-32-004:8.  Thus, by looking at each BMU as a whole, the habitat

effectiveness standard will be met during and after the project, and following the

project both BMUs will meet the core standard.  Open road density will increase in

BMU 11 during the project, but will remain in compliance with the standard in

both BMUs during and after the project.  Although both open motorized route

density and total motorized route density will increase during the project, after

completion, there will be no net increase in either of these factors.  Id. at 8-10.

The biological assessment also concluded there are no known den sites in the

project area, and activities that take place in spring habitat will avoid the period of

spring use.  Id. at 11.  In analyzing cumulative effects, the biological assessment

noted one other on-going timber harvest project, the Obermayer Project, that is

located near the Grizzly Project and would overlap in time with it.  Id. at 13.

Based on this review, the Forest Service concluded the project may affect

but is not likely to adversely affect the grizzly bear because it will increase core

habitat and bring both BMUs into compliance with road density standards

following the project and because displacement of bears is minimized by confining

activities to a small area at any given time and limiting project activity during the

bears' active season.  AR 1-32-004:14.  The Fish and Wildlife Service concurred

in the determination that the Grizzly Project may affect but is not likely to
adversely affect the grizzly bear.  AR 1-32-005.

    2.    Miller Project

    The Miller Project is located on the Libby District of the Kootenai National
Forest, near the Cabinet Mountain Wilderness and is in an area with past and
present mining activity for metals such as copper and silver.  AR 2-1-002:20.  The
stated purposes of the project include maintaining long-term productivity of forest
stands, reducing hazardous fuels, providing forest products, reducing negative
roads impacts, maintaining and improving the watershed, grizzly bear habitat and
big game habitat, and improving recreation opportunities.  Id. at 21.

    The Forest Service completed an EIS for the project, and the final EIS
adopted an action alternative that will be completed in two phases.  Id. at 57.  The
Forest Service chose this alternative in part to address cumulative effects from
other activities, including the nearby Montanore Mine and the proposed power
line for the mine and in part to protect and improve core habitat for grizzly bears.
Id.  The preferred alternative permits harvest of 1,898 acres through tractor,
skyline, and helicopter logging, approximately 330 acres of which is helicopter
logging.  Id. at 57-59.  The project will require construction of 3.9 miles of
temporary road, and 1.13 miles of currently closed road would be reopened during

-15-

harvest activities. Id. at 59, 490. The plan also authorizes road storage for 19.2 miles and decommissioning 1.43 miles of road. Id. at 61-62. The project is expected to last 2-5 years, including harvest and post-harvest activities. AR 2-1-001:33.

The Miller Project is physically located in part on BMUs 6 and 7 within the recovery zone and in part on the reoccurring use polygon outside the recovery zone. AR 2-1-002:458-59. A biological assessment was prepared by the Forest Service to address the effects on grizzly bears both inside and outside the recovery zone. AR 2-1-713.

The impacts on grizzly bears inside the recovery zone were analyzed by applying the 2006 interim rules. Id. at 10; see AR 2-3-108. In BMU 6, the project will cause temporary displacement, including displacement during the summer and fall in core habitat, on 1,323 acres during the first phase of the project and 3,772 acres during the second phase. AR 1-2-713:20. In BMU 7, the project will cause displacement on 208 acres. Id. The chart below, taken from the biological assessment, summarizes the various habitat components before, during, and after the project in BMU 6 and 7:

| BMU | Habitat Component | Existing | During Alt. 6a* | During Alt. 6a* | Post |
|-----|-------------------|----------|-----------------|-----------------|------|

| 6 | Habitat effectiveness (%); Std. ≥70% | 70% | 68% | 66% | 70% |
|---|---|---|---|---|---|
| | Linear open road density (miles/sq. mile); Std. ≤0.75 | 0.44 | 0.48 | .63 | 0.42 |
| | Core (% of BMU); Std. ≥55% | 53% | 53% | 54% | 55% |
| | Open motorized route density (% BMU ≥ 1 mi./sq.mi.); Std. ≤33% | 30% | 31% | 32% | 29% |
| | Total motorized route density (% BMU ≥ 2 mi./sq.mi.); Std. ≤26% | 32% | 33% | 34% | 31% |
| 7 | Habitat effectiveness (%); Std. ≥70% | 79% | 79% | 79% | 79% |
| | Linear open road density (miles/sq. mile); Std. ≤0.75 | 0.31 | 0.33 | 0.34 | 0.33 |
| | Core (% of BMU); Std. ≥55% | 67% | 67% | 67% | 67% |
| | Open motorized route density (% BMU ≥ 1 mi./sq.mi.); Std. ≤33% | 21% | 21% | 21% | 21% |
| | Total motorized route density (% BMU ≥ 2 mi./sq.mi.); Std. ≤26% | 20% | 21% | 21% | 20% |

* Alt. 6a and Alt. 6 represent the two phases of the Miller Project.

AR 2-1-713:12.  The biological assessment in BMU 6 concludes bears would be

displaced by human activity and harvest activity, as well as helicopter activities.

There would be helicopter logging in three harvest units during the active bear

season, and additional helicopter logging during the winter season.  Id. at 13.

Road work would be completed during the active bear year.  Both the helicopter

logging and road work would decrease habitat effectiveness, although the

helicopter logging scheduled during the active bear year is not in core habitat.  Id.

at 13, 19.  The future prognostication is that additional core will be created in

BMU 6 by road storage and decommissioning, but there will also be winter helicopter logging in core habitat.  Id. at 14-15.  The areas where winter helicopter logging will occur do not contain any known denning sites.  Id. at 19.

The Forest Service concluded the project complies with the open motorized road density and total motorized road density standards because there will be no net increase after project completion, even though the density will increase in both BMU 6 and 7 during the project.  BMU 6 is currently inadequate to meet the standard for total motorized road density.  The density would increase from 32% to 34% over the course of the project, but would then improve to 31%, which still exceeds the standard, following the project.  Id. at 15-16.  While the project meets the standard for open road density on a BMU basis, in one subunit, or bear analysis area, of BMU 6, open road density exceeds the .75 miles/square mile standard, and in two analysis areas it will exceed the standard during the project.  Id. at 17.

Outside the recovery zone, the Forest Service did not apply the 2006 interim rules.  Instead, the Forest Service examined three factors that may contribute to taking of bears, as defined by § 9 of the ESA.  These factors include access management, food attractants, and livestock presence.  To analyze access management, the Forest Service looks at changes to the baseline condition of open

road density and total motorized road density. Id. at 23.  In this case the Forest

Service concluded the project would cause no changes regarding food attractants

or livestock presence. Id.  The baseline open road density is 2.2 miles/square mile

and baseline total motorized road density is 3.9 miles/square mile.  The biological

assessment concludes the project would not cause any unauthorized take based on

road densities because anticipated road construction would not increase the

densities. Id.

      The particular biological assessment also discussed cumulative effects

inside and outside the recovery zone.   There is an on-going timber harvest project

of nearly 1,864 acres that began in 2008 and will continue through 2013.  The EIS

also addresses other federal actions, such as extensive mining in the area.  On the

other hand the biological assessment does not discuss the cumulative effects of

mining activity. Id. at 24-25; AR 2-1-001:73-85.

      The biological assessment concluded the Miller Project may affect but is not

likely to adversely affect grizzly bears. Id. at 25.  The Fish and Wildlife Service

concurred in the determination that the Miller Project may affect but is not likely

to adversely affect grizzly bears.  AR 2-1-006.1:1.

      3.     Little Beaver Project

The Little Beaver Project is found on the Cabinet Ranger District of the

Kootenai National Forest, west of Thompson Falls, Montana. It is on Forest

Service lands in the Little Bear Creek drainage. AR 3-36-001:14. The project

area involves almost 6,673 acres, and it is adjacent to privately owned lands within

the wildland urban interface. Id. The project is meant to reduce hazardous fuels

that may lead to high intensity wildfires. It does so by reducing dead and downed

trees, reducing ladder fuels, reducing canopy densities, and promoting species that

are better adapted to fire. Id. at 15-16.

The Forest Service completed an Environmental Assessment ("EA") for the

project, and based on the preferred alternative, issued a Finding of No Significant

Impact. Id. at 408. The preferred alternative involves mechanical treatments on

approximately 1,185 acres. The mechanical treatment methods include tractor,

skyline, and helicopter yarding systems. Id. at 27, 29. The project requires

construction of 5.5 miles of new, permanent Forest Service roads, reconstruction

of 2.3 miles of currently closed Forest Service road, and construction of 2.5 miles

of temporary road that would be decommissioned following the project. Id. at 33.

The Little Beaver Project is outside the grizzly recovery zone, but within the

reoccurring use polygon. Id. at 176; AR 3-6-038:8. The Forest Service prepared a

biological assessment because the Little Beaver Project area is located in grizzly

bear habitat. AR 3-6-038. The EA finds that grizzly bear presence is suspected in

the project area. AR 3-36-001:175 (Table 3-47). However, the biological

assessment states that grizzly bears are known to occur in the project area. AR 3-

6-038:6 (Table 2). The biological statement also claims that there have been no

recorded sightings of grizzly bears in the Little Beaver Creek drainage or the

project area. Id. at 7.

The Forest Service concluded the Little Beaver Project may affect but is not

likely to adversely affect the grizzly bear. Id. at 9.  The biological assessment

concludes the baseline road conditions for the reoccurring use polygon -- .9

miles/square mile of linear open road density and 2.6 miles/square mile of linear

total road density – would not be increased by the project. Id. at 7. Another factor

considered is that all roads constructed for the project will be gated to restrict

public access, which the biological assessment then states will cause minimal

habitat loss. Id. Timber harvest activities may temporarily displace grizzlies from

approximately 3,269 acres, and road use and construction may temporarily

displace grizzlies from approximately 2,265 acres. Id. at 9. The biological

assessment does not specifically discuss whether or how helicopter logging will

impact grizzly bears. The EA and biological assessment discuss cumulative

effects by examining past, present and reasonably foreseeable activities within the

reoccurring use polygon, primarily examining other timber projects. Id.; AR 3-36-

001:178. The Fish and Wildlife Service concurred in the determination that the Little Beaver Project may affect but is not likely to adversely affect the grizzly bear. AR 3-6-039.

## D.   Plaintiff's claims[4]

Plaintiff makes several claims in its first amended complaint. First, it reasons the Forest Service and Fish & Wildlife Service were arbitrary and capricious and did not rely on the best available science when they concluded the projects are not likely to adversely affect the grizzly bear, thus violating the § 7 consultation requirements of the ESA. Plaintiff insists the projects will adversely affect grizzly bears because (1) the projects cause unpermitted take and (2) there will be displacement of grizzly bears because of roads and helicopter logging. Plaintiff maintains the decisions made do not rely on the best available science because the science has changed since the 1995 Incidental Take Statement. They also contend the Wakkinen study is flawed.

Second, Plaintiff holds the projects will violate § 9 of the ESA because they will cause unpermitted take both inside and outside the grizzly recovery zone. Plaintiff maintains there will be take because the projects do not comply with the

---

[4] In this section, the claims are set forth in the order they are set forth in the Amended Complaint. Below, the issues are addressed in the same order as in the parties' briefs.

requirements of the 1995 Incidental Take Statement inside the recovery zone for the Grizzly and Miller Projects. Outside the recovery zone, Plaintiff argues there is no incidental take statement, and the Miller and Little Beaver Projects will end up causing a take by increasing road densities and displacing grizzly bears.

Third, Plaintiff asserts the Projects violate NEPA because the Forest Service did not take a hard look at the adequacy of the habitat standards it applied. Here the contention is that the EIS's and EA do not consider the weaknesses in the Wakkinen study nor do they account for new science that has become available since the Wakkinen study, and they fail to assess whether standards are adequate outside the recovery zone.

Fourth, Plaintiff reasons the Projects violate NEPA because the Forest Service did not adequately consider the cumulative impacts of the projects. In particular, Plaintiff claims the Forest Service did not consider the cumulative impacts of road construction and displacement, and other on-going road use. A secondary failure is the claim that construction is not disclosed or discussed as it should have been.

Fifth, Plaintiff claims the Forest Service violated NEPA and the ESA because it did not conduct a NEPA analysis or ESA consultation before adopting

-23-

the 2006 interim rules.[5]

Sixth, Plaintiff insists the Forest Service violated NFMA and NEPA because the projects allow activities that are not compatible with the needs of the grizzly bears, in violation of the Kootenai Forest Plan. The argument is that the NEPA documents do not disclose or address whether the Forest Plan requirements are met. They are also claimed to be inadequate because the projects violate NFMA in that the record shows that the projects are not, in fact, compatible with grizzly bears needs.

### III. Standard of Review

### A.    Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is a particularly appropriate tool for resolving claims challenging agency action. See Occidental Engr. Co. v. INS, 753 F.2d 766, 770 (9th Cir. 1985). Summary judgment is appropriate in this case because the issues presented address

---

[5] Although this claim is included in the Amended Complaint, Plaintiff does not include this claim in its briefing.

the legality of Defendants' actions based on the administrative record and do not require resolution of factual disputes.

## B.  Standard of APA Review

Judicial review of an agency's compliance with the ESA, NEPA, and NFMA are governed by the judicial review provisions of the APA.  Native Ecosystems Council v. Dombeck, 304 F.3d 886, 891 (9th Cir. 2002).  Agency decisions can only be set aside under the APA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) (quoting 5 U.S.C. § 706(2)(A), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)).  Review under the arbitrary and capricious standard is "narrow," but "searching and careful."  Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989).  Agency action can be set aside "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983).  In any event the issue is "whether the [agency's] decision was based on a consideration of the relevant

-25-

factors and whether there has been a clear error of judgment . . . [The court] also

must determine whether the [agency] articulated a rational connection between the

facts found and the choice made.  [The] review must not rubber-stamp . . .

administrative decisions that [the court deems] inconsistent with a statutory

mandate or that frustrate the congressional policy underlying a statute." Ocean

Advocates v. U.S. Army Corps of Eng'rs, 361 F.3d 1108, 1119 (9th Cir. 2004)

(internal citations and quotations omitted).  In performing this legal obligation, a

court may not substitute its judgment for that of the agency or merely determine it

would have decided an issue differently.  Or. Natural Res. Council, 476 F.3d at

1035.

### IV.  Analysis

**A.    Applicable Forest Service standards**

Because the parties disagree which standards should apply to the projects,

the Court ordered supplemental briefing to clarify which standards apply.  Both

parties agree that when this Court vacated and remanded the Access Amendments

in Cabinet Resource, the prior rules that were in place went back into effect.  See

Paulsen v. Daniels, 413 F.3d 999, 1008 (9th Cir. 2005).  That is the extent of their

agreement.

The Plaintiff takes the position that the standards set forth in the 1995

-26-

Incidental Take Statement are the only applicable standards.[6] Additionally,

Plaintiff insists that any reliance on the 1998 Rule Set is invalid because the 1998

Rule Set never went through a NEPA process or consultation with the Fish &

Wildlife Service.  Such consultation was required because the 1998 Rule Set

constitutes a land management action that affects a listed species.  See Pacific

Rivers Council v. Thomas, 30 F.3d 1050, 1052-55 (9th Cir. 1994).  Plaintiff

maintains the 1998 Rule Set is invalid because it was the subject of a lawsuit that

settled, based on the condition that the Forest Service would amend the Forest

Plan.  However, Plaintiff concedes the settlement agreement did not expressly

keep the Forest Service from implementing the entire 1998 Rule Set. According to

Plaintiff, because Cabinet Resource vacated the prior Access Amendments and the

Forest Service has not completed a new NEPA process for the Access

Amendments, the 1995 Incidental Take Statement standards control until that

process is complete.

On the other hand Defendants reason that when this Court vacated the

Access Amendments in the Cabinet Resource case, the prior rules, including the

---

[6] Plaintiff states in supplemental briefing that the 1995 Incidental Take Statement amended the Forest Plan, a statement also made in briefing. E.g. Pl.'s Supp. Br. at 2. Defendants are correct that the 1995 Incidental Take Statement, produced by the Fish & Wildlife Service, did not amend the Forest Plan because only the Forest Service can amend its Forest Plan. Def.'s Reply at 3 (citing 16 U.S.C. § 1604(f)(4)).

1995 Incidental Take Statement, went into effect. Defendants state that it applies the 1995 Incidental Take Statement "as informed by" the best available science set forth in the 1998 Rule Set and that the 1998 Rule Set "provides guidance for implementing grizzly bear access management parameters." Def.'s Supp. Br. at 1, 2. Defendants argue the 1995 Incidental Take Statement required the Forest Service to work with the Interagency Grizzly Bear Committee to develop access management recommendations for open road, open motorized, and total motorized route density and core habitat, and the result is the 1998 Rule Set. Id. at 3 (citing AR 1-31-041:10). The 1998 Rule Set, in turn, states that it will remain in place until a revision of the Forest Plans, i.e. until the Access Amendments are complete. AR 1-31-024:1.

Defendants insist the 2001 settlement agreement is no longer in effect because it lasted only until "final decisions regarding the [Access Amendments] become effective." Def.'s Supp. Br. at 5 (citing AR 4-1-005:3-4). The contention is that the prior Record of Decision on the Access Amendments fulfilled this term of the settlement agreement, and that it is no longer enforceable. Regardless of whether the settlement agreement is still in force, Defendants state that the only provisions of the 1998 Rule Set the settlement agreement restricted it from using do not apply here.

-28-

The best answer to this debate is that the 1995 Incidental Take Statement, as modified by the 1998 Rule Set, applies to the projects. The 1995 Incidental Take Statement directed the Forest Service to work with the Interagency Grizzly Bear Committee to develop access management recommendations and to adopt those recommendations. AR 1-31-041:10. The 1995 Incidental Take Statement states that when the access management recommendations are adopted, "this incidental take statement will be amended to incorporate new information generated by the Committee." Id. at 11. The Forest Service argues this is exactly what it did with the 1998 Rule Set. Plaintiff's argument seems to take umbrage with the process that led to the 1998 Rule Set and is, in effect, an attempt to re-litigate the case that resulted in the 2001 settlement agreement in order to vacate the 1998 Rule Set. Assuming the 2001 settlement agreement is in effect, the Plaintiff concedes it does not actually prohibit the Forest Service from relying on the 1998 Rule Set, and if it is no longer in effect, there is nothing barring the Forest Service from relying on its management direction until the Forest Plans are amended by new Access Amendments. While the Plaintiff may not agree with the use of the 1998 Rule Set, that proposition is irrelevant here. The 1995 Incidental Take Statement contemplates that its guidance will be amended based on the access management standards developed by the Forest Service, working with the Interagency Grizzly

-29-

Bear Committee.  AR 1-31-041:11.  For purposes of this case, the standards in the

1998 Rule Set control.

**B.    Whether the projects will cause unauthorized take in violation of § 9 of the ESA**

      1.    <u>Legal Standard</u>

The ESA is designed to conserve the ecosystems upon which endangered

and threatened species depend and to provide a program for the conservation of

such species. 16 U.S.C. § 1531(b).  To this congressional end, § 9 of the ESA

provides that no person may "take" a species listed as endangered.  16 U.S.C. §

1538(a)(1)(B).  The Fish and Wildlife Service has also applied the take

prohibitions to the grizzly bear, which is on the threatened list. 50 C.F.R. §

17.40(b); <u>see also</u> 16 U.S.C. § 1533(d).  "The term 'take' means to harass, harm,

pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in

any such conduct. "  16 U.S.C. § 1532(19).  In the context of "take," to "harass"

refers to "an intentional or negligent act or omission which creates the likelihood

of injury to wildlife by annoying it to such an extent as to significantly disrupt

normal behavioral patterns which include, but are not limited to, breeding,

feeding, or sheltering." 50 C.F.R. § 17.3.  "Harm" refers to "an act which actually

kills or injures wildlife.  Such act may include significant habitat modification or

degradation where it actually kills or injures wildlife by significantly impairing

essential behavioral patterns, including breeding, feeding or sheltering." Id. If a

proposed action is likely to cause take, the Fish and Wildlife Service may issue

"written statement" that sets forth the predicted impact to the listed species,

reasonable and prudent measures necessary to minimize take, and terms and

conditions for implementation of those measures. 16 U.S.C. § 1536(b)(4); 50

C.F.R. § 402.14(i). If the action agency complies with the terms and conditions of

the incidental take statement, the expected take is exempted from the take

prohibition. 16 U.S.C. § 1536(o)(2).

> 2. Take inside the Recovery Zone

Plaintiff complains the Grizzly and Miller Projects violate the § 9

prohibition on take because neither project complies with the terms of the 1995

Incidental Take Statement. The applicable standards derive from the 1995

Incidental Take Statement, as amended by the 1998 Rule Set. If the Forest Service

complies with these standards, then it is exempted from the § 9 take prohibition

for these projects. 16 U.S.C. § 1536(o)(2).

A specific challenge here is the projects violate the open road density

standard applicable under the 1995 Incidental Take Statement, .75 miles/ square

mile, because the EIS's and Biological Assessments show the projects will not

-31-

comply at the level of the bear analysis area, but instead they assess compliance only at the BMU level. The 1995 Incidental Take Statement does include a discussion of certain bear analysis areas which are exceeding the .75 miles/ square mile.[7] E.g. AR 1-31-041:6-7. However, it is incorrect to assert that the Forest Service must assess open road density by examining bear analysis areas. The 1995 Incidental Take Statement provides that "proposed projects within the [Cabinet/Yaak Ecosystem] . . . would exceed the level of incidental take authorized in this incidental take statement if the proposed project increases the density of open roads above the current Forest Plan standard, increases the density of open motorized trails, increases the net total motorized access route density, or decreases the existing amount of core area in the affected BMU's." Id. at 11 (emphasis added). This substantiates that the 1995 Incidental Take Statement contemplated analysis at the BMU level. Moreover, the 1998 Rule Set, while it does not directly address open road density standards, holds that "[c]ore and density route calculations will be applied to Recovery Plan Bear Management Units." AR 1-31-024:4.

---

[7] Plaintiff also argues a 1990 interagency report supports its position that road density must be measured in each bear analysis area. See AR 1-31-20:12. However, the 1995 Incidental Take Statement and 1998 Rule Set do not incorporate any recommendations from this report to measure road density for each bear analysis area. Plaintiff offers nothing to show the 1990 report should control over the subsequent documents by the Fish & Wildlife Service and Forest Service that focus instead on the BMU.

-32-

Looking at the BMU level, the Biological Assessments demonstrate that the Grizzly and Miller Projects meet the standard for open road density. In the Grizzly Project, the open density will increase in BMU 11 from .44 miles/square mile to .58-.57 during project activities and return to .48 miles/square mile after the project. In BMU 14, the open road density will increase slightly during the project from .57 miles/square mile to .58 miles/square mile, and return to .57 miles/square mile after the project. AR 1-32-004:10. For the Miller Project in BMU 6, the open road density will increase from .44 miles/square mile to a maximum of .63 miles/square mile, but decrease to .42 miles/square mile after the project. AR 2-1-713:12. In BMU 7, the open road density will increase from .31 miles/square mile to a maximum of .34 miles/square mile, but decrease to .33 miles/square mile after the project. Id. All of these densities, during and after the projects, comply with the .75 miles/square mile standard at the BMU level, as required under the 1995 Incidental Take Statement and the 1998 Rule Set.

Plaintiff also claims there will be take because the 1995 Incidental Take Statement does not permit any decrease in the existing amount of core area, while the projects allow decreases of core area during their implementation. The 1998 Rule Set applies. It states that there will be "[n]o net loss of existing Core area." AR 1-31-024:2. A standard permitting no "net" increase or decrease permits

-33-

increase or decrease during the project, provided the parameter at issue remains the same or better after the project. Alliance for the Wild Rockies v. U.S. Forest Service, CV 07-150-M-DWM at 27-28 (D. Mont. July 30, 2008). The Biological Assessments for the Grizzly Project and Miller Project reveal there will be no net loss of core grizzly habitat. In the Miller Project, there be no decreases even during implementation in either BMU 6 or BMU 7. AR 2-1-713:12. As to the Grizzly Project, core habitat will not decrease in BMU 11, but will remain stable during the project and it will increase to comply with the 55% core habitat standard following the project's completion. AR 1-32-004:8. There will be a one percent decrease in core habitat during the Grizzly Project in BMU 14, but it will not go below the 55% standard and it will return to its pre-project level following completion of the project. Id. The projects comply with the 1998 Rule Set standards for changes to core habitat.

Next, Plaintiff contends the 1995 Incidental Take Statement incorporated the recommendations from the 1994 Interagency Grizzly Bear Committee Taskforce Report regarding application of a minimum core habitat size and a minimum ten year duration for each core habitat block. Defendants respond that, while the 1994 Report by the Interagency Grizzly Bear Taskforce made recommendations as to core habitat size and duration, the 1995 Incidental Take

Statement and 1998 Rule Set do not include any standards on these factors. On this question Defendants have the upper hand. The 1994 Report discussed core habitat size and duration, but the 1995 Incidental Take Statement does not set interim standards for size or duration, nor does it require the Forest Service to develop standards for these parameters. AR 2-3-96:5-6; AR 1-31-041:9-11. Likewise, the 1998 Rule Set includes no requirements regarding core size or duration. The Projects do not violate § 9 because they do not consider core size or duration.

### 3.    Take outside the recovery zone

Plaintiff suggests the Miller and Little Beaver Projects will result in take in the reoccurring use polygon outside the recovery zone. They hold the 1995 Incidental Take Statement does not apply to the areas outside the recovery zone and, even if it did, the open road densities exceed the .75 miles/square mile standard required under the 1995 Incidental Take Statement and that the projects will increase the densities, causing additional take. The Defendants respond that the .75 miles/square mile standard applies only in the recovery zone and there will be no take because the projects do not increase the baseline road densities.

In 2003, a Forest Service biologist completed a document entitled "Incidental Take Analysis for Grizzly Bears That Occur Outside Recovery Zones

-35-

on the Kootenai and Idaho Panhandle National Forests and a Portion of Lolo National Forest." AR 2-3-104:1. This paper recognizes that grizzly bears have expanded outside the areas identified as recovery zones in the 1993 Recovery Plan, and that the bears have taken up in the areas referred to as the reoccurring use polygon. Even though bears may be outside the recovery zone, the protections of the ESA, including the take prohibition, still apply. Id. at 3. To decide if incidental take is occurring in the areas outside the recovery zone, the document examined three factors: access management (i.e. road densities), food attractants, and livestock presence. Id. Based on the analysis of the existing road densities in the reoccurring use polygon, the Forest Service concluded "incidental take of grizzly bear[s] likely is occurring on those portions of the [Kootenai National Forest] outside the recovery area" and "the level of take is higher in these areas than inside the recovery zone." Id. at 5. The document states it evolved from "a verbal agreement" with the Fish and Wildlife Service regarding the appropriate analysis methodology for the areas outside the recovery zone. Id. at 3.

From a legal perspective it is most likely the case that the 1995 Incidental Take Statement does not apply outside the recovery zone. The Incidental Take Statement states that its "terms and conditions . . . implement the reasonable and prudent measures" for the "Cabinet/Yaak Grizzly Bear Recovery Zone." AR 1-

-36-

31-041:10 (emphasis added).  Grizzly bears were located only inside the recovery

zone and there was no regular use by grizzly bears outside it at the time of the

1993 Recovery Plan and the 1995 Incidental Take Statement.  AR 2-3-104:3.

Defendants agree the 1995 Incidental Take Statement only applies to the recovery

zone as to the road density standard, yet paradoxically they argue the 1995

Incidental Take Statement permits incidental take outside the recovery zone.[8]

They cannot have it both ways.  The 1995 Incidental Take Statement permits take

only if the Forest Service is following the measures specified therein, and the

Forest Service itself states that it is not following these measures outside the

recovery zone.  Consequently, the 1995 Incidental Take Statement is not

applicable outside the recovery zone, including both the .75 miles/square mile

road density standard and the permit to commit incidental take.

The 2003 paper regarding take outside the recovery zone is also insufficient

to allow the incidental take.  By the Forest Service's own admission, there is take

already occurring in the project areas outside the recovery zone due to existing

road densities, and it will continue to occur during the Miller and Little Beaver

---

[8] The Biological Assessments for the Little Beaver and Miller Projects, when discussing areas outside the recovery zone, make no reference to the 1995 Incidental Take Statement.  The Defendants cannot rely on this rationale post hoc to justify their decision when it appears the agency did not consider it.  Burlington Truck Lines, Inc. v. U.S., 371 U.S. 156, 168-69 (1962).

Projects. AR 2-3-104:5. However, the 2003 document, based on a verbal

agreement with the Fish & Wildlife Service, is not a "written statement" from the

Fish and Wildlife Service authorizing such take, "specif[ying] those reasonable

and prudent measures . . . necessary or appropriate to minimize such impact," or

"set[ting] forth the terms and conditions . . . that must be complied with by the

[Forest Service] to implement the measures." 16 U.S.C. § 1536(b)(4). Because

take is occurring without an incidental take statement, the take cannot be

exempted from the prohibition of § 9. 16 U.S.C. § 1536(o)(2).

The Forest Service urges the Miller and Little Beaver Projects will cause

only de minimis increases in road density, and, while there is take occurring

outside the recovery zones, no incidental take permit is needed because the minor

changes from these projects will not affect the amount of take occurring. The

parties offer various calculations of the road densities and whether they will

increase. They also disagree as to whether private lands should be counted in the

road density total and they disagree about how precise the road density

calculations must be.[9] Thus, while the road densities listed in the Biological

Assessments show no increase in linear open road density, AR 2-1-713:23; AR 3-

---

[9] As Plaintiff points out, other measurements of road densities are rounded to the
hundredths place, although the Defendants rounded to the tenths place in calculating road density
outside the recovery zone. Pl.'s Reply at 11 (citing AR 1-19-004:301; 1-31-041:6-7).

6-038:7, the Plaintiff offers calculations, based on the road density numbers in the 2003 document and the additional miles of road anticipated from these projects, to show that densities will increase. Pl.'s Reply at 10-11. The disagreement over the road densities and their level of change is nonetheless irrelevant. There is take occurring in the project areas now, and it will continue to occur during the projects, potentially caused by the projects. The ESA does not permit an agency to approve a project that will contribute to the taking of a species, even if the take remains at or near the current level. 16 U.S.C. § 1538(a)(1)(B). The ESA prohibits take, unless an agency is complying with a written incidental take statement from the Fish & Wildlife Service specifying the measures necessary to minimize take. 16 U.S.C. § 1536(b)(4); 16 U.S.C. § 1536(o)(2). There is no such exemption here for the areas outside the recovery zone. Consequently the inescapable conclusion is the projects thus violate § 9.

## C.   Whether the decision that the Projects are not likely to adversely impact grizzly bears was arbitrary and capricious

### 1.   Section 7 consultation requirements

Section 7(a)(2) of the ESA requires federal agencies, in consultation with the Fish & Wildlife Service or the National Marine Fisheries Service, to ensure that "any action authorized, funded, or carried out" by the agency "is not likely to

-39-

jeopardize the continued existence of any endangered species or threatened

species or result in the destruction or adverse modification" of the species' critical

habitat.  16 U.S.C. § 1536(a)(2).  In fulfilling the requirements of § 7(a)(2) of the

ESA, agencies must "use the best scientific and commercial data available."  16

U.S.C. § 1536(a)(2).

A federal agency proposing an action (the "action agency") must first

determine whether the action "may affect" a listed species or critical habitat.  50

C.F.R. § 402.14(a).  If the action agency determines its proposed action "may

affect" a listed species or critical habitat, it must then consult with the consulting

agency, here the Fish and Wildlife Service.  There are two forms of consultation:

formal and informal.  Formal consultation must take place where the action agency

determines that a proposed action is "likely to adversely affect" a listed species.

50 C.F.R. § 402.14.  Informal consultation "includes all discussions,

correspondence, etc., between the Service and the [action] agency."  50 C.F.R. §

402.02.  Where the action agency determines, with the written concurrence of the

consulting agency, that a proposed action "may affect," but is "not likely to

adversely affect" a listed species, formal consultation is not required.  50 C.F.R. §

402.14(b)(1); 50 C.F.R. § 402.12(k)(1).  The action agency can reach its no

adverse effects determination through preparation of a biological assessment or

informal consultation. 50 C.F.R. § 402.14(b)(1).

In this case, the Forest Service determined that all three projects may affect, but are not likely to adversely affect, the grizzly bear, following the preparation of a biological assessment. AR 1-32-004; AR 2-1-713; AR 3-6-038. The Fish & Wildlife Service concurred in each of the three determinations. AR 1-32-005; AR 2-1-006.1; AR 3-6-039.

2.    Whether there will be take that is likely to adversely affect grizzly bears

Plaintiff reasons that if the Court finds there will be a § 9 violation, then it follows that the projects are likely to adversely affect the grizzly bears, because a taking is by definition an adverse impact. Defendants do not dispute this characterization, but repeat their argument that there is no violation of § 9. A Fish &Wildlife Service Handbook regarding § 7 consultations defines "Is likely to adversely affect" in part to include actions where incidental take is anticipated to occur. AR 2-3-270:19. Because the projects involved will cause unpermitted take, the taking is an adverse effect, and the Forest Service's and Fish & Wildlife's determinations that the projects are not likely to adversely affect the grizzly bear violate § 7 of the ESA.

3.    Whether the "not likely to adversely affect" determinations are arbitrary because of displacement, roads, and helicopter logging

Next, Plaintiff insists the Forest Service and Fish & Wildlife Service violated the ESA and APA by concluding that displacement during logging and road building, open and closing of roads, and helicopter logging will not adversely affect grizzly bears.

During the Grizzly Project, BMU 11 will lose 280 acres of core habitat, but the project requires creating 1,000 acres of replacement habitat by berming of roads. There may also be temporary impacts on 2,290 acres within core habitat due to road decommissioning, but that activity would take place during summer to avoid impacting bears from foraging in spring habitat and to avoid impacting bears during the huckleberry season. AR 1-32-004:7. The Grizzly Project also involves constructing 3.2 miles of temporary road, including 1.4 miles of new road and 1.8 miles of reconstructed road. AR 1-33-006:14.

The Miller Project will cause temporary displacement in BMU 6, including displacement during the summer and fall in core habitat, on 1,323 acres during the first phase of the project and 3,772 acres during the second phase. AR 1-2-713:20. In BMU 7, the project will cause displacement on 208 acres. Id. The Miller Project involves  construction of 3.9 miles of temporary road, and 1.13 miles of currently closed road would be reopened during harvest activities. AR 2-1-002:59, 490.

-42-

The Little Beaver Project Biological Assessment states that there have been no recorded sightings of grizzly bears in the Little Beaver Creek drainage or the project area. However, the EA states that grizzly bear presence is suspected in the project area, and the Biological Assessment states that grizzly bears are known to occur in the project area. AR 3-36-001:175 (Table 3-47); AR 3-6-038:6 (Table 2). Little Beaver's harvest activities may temporarily displace grizzlies from approximately 3,269 acres. Road use and construction may temporarily displace grizzlies from approximately 2,265 acres. AR 3-36-038:9. The project requires construction of 5.5 miles of new, permanent Forest Service roads, reconstruction of 2.3 miles of currently closed Forest Service road, and construction of 2.5 miles of temporary road that would be decommissioned following the project. AR 3-36-001:33.

In a different case this Court concluded that minimal, temporary displacement of grizzly bears due to road opening and closing likely does not constitute an adverse effect. Alliance for the Wild Rockies v. U.S. Forest Service, CV 07-150-M-DWM at 29 (D. Mont. July 30, 2008). However, if displacement is significant enough, "either due to the number of roads being opened and closed or their location," there may be an adverse impact. Id. Because the project at issue in Alliance for the Wild Rockies involved construction of six temporary roads,

-43-

totaling less than a mile in length, and also required closing other roads to protect

bears, the impacts were not significant enough to adversely impact the bears. Id.

In contrast, in yet another case this Court concluded that a mining operation

within the Cabinet-Yaak recovery zone would jeopardize grizzly bears by

displacing them from approximately 7,000 acres. Rock Creek Alliance v. U.S.

Fish & Wildlife Service, 390 F. Supp. 2d 993, 1006-09 (D. Mont. 2005).

Similarly, a Washington district court concluded a plan to allow snowmobile

activity in caribou winter habitat would cause jeopardy to a caribou population of

35-45 animals. Defenders of Wildlife v. Martin, 2007 WL 641439 at ** 2, 7 (E.D.

Wash. Feb. 26, 2007).  Because it was shown snowmobiling caused numerous

negative impacts to caribou, including altering their distribution and affecting

feeding and reproduction, and because of the small population size, the

Washington court concluded the snowmobiling would jeopardize the already small

population. Id. at *7.

Plaintiff analogizes to Martin, and claims there is a very small population of

grizzlies, and activities such as road building are known to have negative effects

on bears. See e.g. AR 1-31-041:3.  The argument goes on to contend the projects

taken together, will potentially displace bears from more acreage than in Rock

Creek.  Defendants retort that, unlike Rock Creek, the displacement here is only

-44-

temporary and it will not all occur at one time, and the projects require creation of additional core habitat for bears.  The argument contends, as in Alliance for the Wild Rockies, the minimal displacement involved will not adversely affect bears. To top the argument off, Defendants argue no bears have been sighted in the Little Beaver Project area.

The Plaintiff has a compelling argument that both the number and location of roads here show more significant impacts than in Alliance for the Wild Rockies and thus demonstrate bears are much more likely to be adversely affected.  There is significantly more road building for the projects than in Alliance for the Wild Rockies, both individually and collectively.  Further, the locations are also significant because there will be several miles of roads and potentially thousands of acres of displacement in core habitat.  The Grizzly Project's physical location is near another logging project, the Obermayer Project, that may also be causing displacement of bears, and the Miller Project is adjacent to the area where the Rock Creek Mine will potentially be built.  AR 1-32-004:8; AR 2-2-030:35.  It is difficult to reconcile the statement that there are no bears in the Little Beaver project with other statements in the EA.  It is especially difficult to reconcile it with the Biological Assessment statement that bears are suspected or known to be in the area and with the conclusion that the project will displace bears from

-45-

thousands of acres.  Given the number and location of the roads, the large number

of acres where bears will be displaced, and the small population size, the Plaintiff

has a compelling argument that displacement and roads are likely to adversely

impact the grizzly bears.  Further, it is arbitrary for the agencies to conclude both

that there are no bears in the Little Beaver Project area but that they will be

displaced from thousands of acres.

Even so, the agency is due deference for its conclusions.  The question is

whether it is reasonable for the agency to differentiate this case from Rock Creek

and Martin, since the displacement from the involved projects will not occur all at

once and will not be as long-lasting as from a mining operation.  The agencies

have taken steps to minimize the impacts to grizzly bears, for example by phasing

the Miller Project in two stages to minimize impacts, creating replacement core

habitat in the Grizzly Project, and requiring road decommissioning to create new

habitat and mitigate the impacts of new or reconstructed roads.

This is a close call. There are strong arguments to be made that the projects

are likely to adversely affect the grizzly bears, but the agencies have provided a

close look and reasons for their conclusions that the projects are not likely to

adversely affect the bears.  Because they have provided analysis and reasons for

their conclusion, it is necessary to defer to their decision.

Plaintiff next argues the agencies should have determined that helicopter

logging in the Miller and Little Beaver Projects will adversely affect bears.

According to a 2006 Forest Service handbook on the effects of helicopter use on

grizzly bears, helicopter logging is generally likely to adversely affect bears,

barring some extenuating circumstances. Such circumstances exist, for example,

if bears are not present in the area during logging operations. AR 2-3-250: 4-5.

The handbook also states that projects should be analyzed based on the frequency,

duration, and altitude of helicopter logging to determine the effects on bears. Id.

at 6. This Court has previously held that the Forest Service and Fish & Wildlife

Service erred in determining helicopter logging was not likely to adversely affect

bears where the logging was located in grizzly bear core habitat on the Kootenai

National Forest, and a nearby, similar project had recently been found to adversely

affect grizzly bears. Alliance for the Wild Rockies, CV 07-150-M-DWM at 19-

25. In Alliance for the Wild Rockies, the Court concluded that even the short-term

impacts, with helicopter logging only 2-7 days in each unit, and covering only 99

acres, could adversely impact bears. In that case the agencies had not explicitly

addressed the possible impacts of helicopter logging in the biological assessments.

Id. at 21-23. Ultimately, the Court held that the agencies had not "articulated a

rational connection between the nature and extent of helicopter logging . . . and

their determination that the logging is not likely to adversely affect grizzly bears."
Id. at 25.

The Miller Project plans for helicopter logging in BMU 6 and 7 during the
winter season in core habitat in areas with no known denning sites. AR 2-1-713:
13-15. There will also be helicopter logging in three harvest units during the
active bear season, but those areas are not in core habitat. Id. at 12-13, 19. The
Biological Assessment lists factors that may affect bears' responses to helicopter
logging, such as noise level, altitude, type of aircraft, bears' previous experiences
with aircraft, and proximity to hiding cover, but it does not analyze how these
factors will affect grizzly bear responses to helicopter logging in this particular
situation. Id. at 19. The Little Beaver Biological Assessment does not address the
effects of helicopter logging on grizzly bears. See AR 3-6-038: 6-10. Defendants
insist there will be no adverse impacts from this project's helicopter use because
no bears are known to be in the project area. Def.'s Br. at 16-17.

The agencies probably complied with the ESA in concluding winter
helicopter logging in areas with no known den sites was not likely to aversely
affect grizzly bears. This is one circumstance – where bears are not present at the
time of logging – the Fish & Wildlife Service has identified as justifying a "not
likely to adversely affect" finding. AR 2-3-250: 4-5.

-48-

However, the record provides less support for the conclusion that helicopter logging during the active bear season in the Miller Project will not adversely affect bears. The only justification given in the record is that helicopter logging is not in core habitat, although the harvest units are still within the recovery zone. The Forest Service lists some relevant factors that affect helicopter impacts on bears. Unfortunately, as in <u>Alliance for the Wild Rockies</u>, it fails to discuss these factors, nor does it direct analysis to the factors listed in the § 7 consultation handbook that influence whether bears will adversely impacted, such as the frequency, duration, and altitude of helicopter logging. <u>Alliance for the Wild Rockies</u>, CV 07-150-M-DWM at 21-23. The Forest Service distinguishes this case from <u>Alliance for the Wild Rockies</u> because the logging project at issue there involved core habitat and this does not. However, this distinction is an inadequate basis to conclude there will not be adverse impacts on bears located within the recovery zone. There are too many other considerations that are not discussed or analyzed. The agency failed to consider all the relevant factors and articulate a reasoned basis for its conclusion that helicopter logging during the active bear year will not adversely impact bears.

With the Little Beaver project, it is difficult to assess the basis of the decision that helicopter logging is not likely to adversely affect the bears since the

Biological Assessment does not address the issue, but relies on the conclusion that bears are not in the project area.  If bears are not present in the area, helicopter logging cannot adversely affect them.  However, as stated above, it is difficult to reconcile this statement with the findings that bears may be in the project and with the conclusion above that the Little Beaver project will displace bears from thousands of acres, even though they are theoretically not located in the project area.  These inconsistencies in the record show that the agency's decision that helicopter logging in the Little Beaver Project would not adversely impact bears is arbitrary.

The agencies have not "articulated a rational connection between the nature and extent of helicopter logging . . . and their determination that the logging is not likely to adversely affect grizzly bears." Alliance for the Wild Rockies, CV 07-150-M-DWM at 25.

4.    Whether the "not likely to adversely affect" determinations are based on outdated or irrational standards and information

By law the agency must rely on the best available science when undertaking a consultation process.  16 U.S.C. § 1536(a)(2).  The agency must reinitiate consultation "[i]f new information reveals effects of the action that may affect listed species . . . in a manner or to an extent not previously considered." 50

C.F.R. § 402.16(b). Plaintiff argues new information shows the 1995 Incidental

Take Statement is not based on the best available science because it was premised

on science which said the Cabinet-Yaak grizzly bear population was likely

increasing, and more recent information suggests the population is likely

decreasing.   See Seattle Audubon Society v. Espy, 998 F.2d 699, 703-04 (9th Cir.

1993) (holding that the Forest Service violated NEPA where it relied on "stale

scientific evidence" without addressing more recent, contradictory population

data).

Plaintiff also insists the Fish & Wildlife Service agrees the 1995 Incidental

Take Statement is inadequate because it has stated that "protective measures have

not achieved desired goals for habitat protection in either the United States or

Canada" and "this may pose a significant threat to the grizzly bear population in

the Selkirk/Cabinet-Yaak recovery zone." 64 Fed. Reg. 26730.  Because the 1995

Incidental Take Statement was in place when this was published, Plaintiff claims

the Fish & Wildlife Service thus disavowed the usefulness of the 1995 Incidental

Take Statement.

The 1995 Incidental Take Statement concluded incidental take was not

likely to jeopardize grizzly bears based in part on a belief the population was

increasing (from 12 to 18 bears, significantly smaller than the current estimated

population) and bears were reproducing.  AR 1-31-041:8.  But, the 1995 Incidental

Take Statement was not intended to set standards for the long-term management of

grizzly bears.  It was only intended to require the Forest Service to set standards

for road density and core habitat that would be protective of grizzly bears, and

these standards would be based on the best available science at the time they are

promulgated.[10]  AR 1-31-041:10-11.  Even if the mortality and population data

have changed since publication of the 1995 Incidental Take Statement, the

Plaintiff offers nothing to show that the Forest Service should not be following its

interim guidance, nor does Plaintiff offer different or better scientific evidence that

undercuts the guidance in the 1995 Incidental Take Statement.  The cases relied on

by Plaintiff for this argument are distinguishable because they relate not to best

available science, but to the procedural requirements imposed by NEPA.  E.g.

Seattle Audubon Society, 998 F.2d at 703-04.

The statements by the Fish & Wildlife Service in 1999 do not undermine its

reliance on the 1995 Incidental Take Statement.  Plaintiff has taken a quote out of

context.  The quote is referring broadly to all management efforts, including many

outside the Cabinet-Yaak recovery zone.  Further, the same statement notes that

---

[10] As already discussed, the 1995 Incidental Take Statement did set interim standards that
have remained in place much longer than the agencies likely anticipated, due to the Forest
Service's inability, to date, to enact final, legally defensible standards.

access standards, which the 1995 Incidental Take Statement requires the Forest Service to develop, may reduce potential threats to grizzly bears once they are fully implemented.  64 Fed. Reg. 26732.

Plaintiff also maintains it was arbitrary and capricious to rely on the Wakkinen study because it is not the best available science.   The Court has concluded on two prior occasions that the Wakkinen study is the best available science.  Cabinet Resource Group, 465 F. Supp. 2d at 1085-90; Alliance for the Wild Rockies v. U.S. Forest Service, CV 07-150-M-DWM at 15-16 (D. Mont. July 30, 2008), aff'd, 351 Fed. Appx. 167 (9th Cir. Nov. 2, 2009).  In Cabinet Resource, the plaintiffs made similar arguments as Plaintiff makes here: that the Wakkinen study preserves an inadequate and failing status quo.  E.g. Cabinet Resource Group, 465 F. Supp. 2d at 1086, 1088.  As the Court previously stated: "The Wakkinen study is not the best conceivable scientific information upon which to make access management decisions affecting grizzly habitat. . . .[but t]he issue is whether Wakkinen is the best available information, and the Plaintiffs have not carried their burden to show that it is not."  Id. at 1088.  Here, Plaintiff has offered nothing new or additional to show that the Wakkinen study is not the best available science.  The same determination about the study applies as was determined before.  Id.

**D.** **Whether the projects comply with the Forest Plan standard requiring that they must be compatible with the needs of grizzly bears**

    1.    <u>Legal Standard</u>

NFMA imposes both substantive and procedural requirements on the Forest Service. 16 U.S.C. §§ 1600–1687. Procedurally, it requires the Forest Service to develop a forest plan for each forest it manages. 16 U.S.C. § 1604(a). Subsequent individual site-specific projects must not only comply with NFMA but also be consistent with the governing forest plan. 16 U.S.C. § 1604(i); <u>Idaho Sporting Cong., Inc. v. Rittenhouse</u>, 305 F.3d 957, 961–62 (9th Cir. 2002).

    2.    <u>Analysis</u>

The 1987 Kootenai Forest Plan provides that on Management Situation 1 lands, "[m]anagement decisions will favor the needs of the grizzly bear when grizzly habitat and other land use values compete. Land uses which can affect grizzlies and/or their habitats will be made compatible with grizzly needs or such uses will be disallowed of eliminated." AR 1-19-004:293. Plaintiff argues the Forest Service never made a finding that the projects comply with this standard, and because the agency did not explain how the projects comply with the Forest Plan, there is a violation of NFMA. See <u>Native Ecosystems Council v. U.S. Forest Service</u>, 418 F.3d 953, 962 (9th Cir. 2005) (holding that the Forest Service

violates NFMA where a court is "unable to determine from the record that the agency is complying with the forest plan standard").

The Forest Service responds that its analysis for each project addresses the Forest Plan's policies and standards and demonstrates compliance with the standard.   For example, the Record of Decision for the Grizzly Project states that the Forest Plan "provides the primary management direction for the decision." AR 1-33-006:9.  The EIS states the project is "tiered to and incorporates the Forest Plan in its entirety" and it lists several Forest Plan management areas, including grizzly bear habitat management.  AR 1-33-001:48-49.  Defendants also refer generally to the discussion of grizzly bears in the EIS characterizing it as discussing grizzly bear needs in compliance with the Forest Plan.  Def.'s Br. at 21-22 (citing AR 1-33-001:134-47; AR 1-33-005:120-128).  Both the draft and final EIS state that the Grizzly Project would meet Forest Plan standards, including requirements for displacement, road density, and maintaining corridors between cutting units, even though the documents do not specifically mention the requirement for compatibility with grizzly bear needs.  AR 1-33-001:143; AR 1-33-005:128.

The Miller Project contains similar references to the Forest Plan.   The Record of Decision states that the Forest Plan "provides the primary management

direction for the decision." AR 2-1-001:7. The Defendants again refer to the
entire discussion on grizzly bears as showing that the project is compatible with
the needs of the grizzly bears. Def.'s Br. at 21-22 (citing AR 2-1-002:458-94).
The EIS states the Miller Project complies with 1987 Forest Plan standard, but it
does not explicitly address the needs of the grizzly bear. AR 2-1-002:492. The
Little Beaver EA and Record of Decision also mention the Forest Plan. The EA
states that the Little Beaver Project "is consistent with applicable Forest Plan
standards and goals." AR 3-36-001:20. It also lists applicable standards from the
Forest Plan, but does not list any standards related to grizzly bears. AR 1-36-
001:21 (Table 1-1). The Defendants rely on the general discussion of grizzlies as
demonstrating compliance with the standard. Def.'s Br. at 21-22 (citing AR 3-36-
001:175-79). The Forest Service also insists that both the Grizzly and Miller
Projects will cause improvements in habitat effectiveness, core habitat, and road
density following completion. Def.'s Br. at 22-23.

　　　Plaintiff disputes that any of the record citations relied on by Defendants
show compliance with this Forest Plan standard because none of the documents
specifically address the standard and how or why the projects comply with it.
Instead, Plaintiff asserts the Defendants are offering an unacceptable post hoc
justification for the Forest Service's conclusions. See Burlington Truck Lines,

-56-

Inc. v. U.S., 371 U.S. 156, 168-69 (1962).

Again the question is difficult to answer based on the record.[11] The EIS's,

EA, and Biological Assessments do not explicitly address whether the projects are

compatible the grizzly bear needs, as required by the Forest Plan.  Where the

analyses listed Forest Plan standards and rules that must be complied with, they

did not include this standard as one to be considered.  E.g. AR 1-33-001:143; AR

1-33-005:128; AR 1-36-001:21.  Defendants' blanket reliance on the discussions

of grizzly bears and discussion of compliance with other standards, such as habitat

effectiveness and road densities, is insufficient to show compliance with the

standard at issue here.  There is nothing in the record to indicate that when the

Forest Service considered the other applicable standards, it only concluded that

compliance with those standards demonstrated the projects were compatible with

grizzly bear needs.  This is an impermissible post hoc justification to support the

agency's decision.  Burlington Truck Lines, Inc, 371 U.S. at 168-69.  There is a

NFMA violation because the Court is "unable to determine from the record that

---

[11] Plaintiff's argument seems more consistent with a NEPA-based argument that the Forest Service failed to adequately disclose whether the projects comply with the Forest Plan. However, Plaintiff's briefs do not make any arguments under NEPA, although the Amended Complaint includes a NEPA claim regarding compliance with the Forest Plan. Amd. Compl. ¶ 144. Since Plaintiff did not make a NEPA argument in its briefs, no NEPA claim is addressed here.

the agency is complying with the forest plan standard." Native Ecosystems

Council, 418 F.3d at 962.

**E.     Whether the Forest Service complied with NEPA's requirement to take a "hard look" at the effects of the projects**

1.     Legal Standard

NEPA is intended to focus the attention of the government and the public on

the likely environmental consequences of a proposed agency action. Marsh, 490

at 371. The Act "places on the agency the obligation to consider every significant

aspect of the environmental impact of the proposed action" and "ensures that the

agency will inform the public that it has indeed considered environmental

concerns in its decision-making process." Baltimore Gas & Electric Co. v. Natural

Resources Defense Council, Inc., 462 U.S. 87, 97 (1983) (citations omitted).

NEPA imposes procedural obligations on government agencies. "NEPA

does not work by mandating that agencies achieve particular substantive

environmental results." Marsh, 490 U.S. at 371. NEPA dictates the necessary

procedure an agency must follow, but does not state any requirements relating to

the outcome of the agency's decision-making process. Robertson v. Methow

Valley Citizens Council, 490 U.S. 332, 359 (1989).

NEPA requires a federal agency to prepare an EIS detailing the

-58-

environmental impacts of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS must describe the environmental impacts of the proposed agency action, any adverse environmental impacts of the proposed action that cannot be avoided, and alternatives to the proposed action which were considered by the agency. Robertson, 490 U.S. at 349.

    2.    Cumulative Effects

Plaintiff argues the Forest Service did not take a hard look at the cumulative effects of the projects. First, Plaintiff claims the Forest Service should have examined cumulative effects at a forest-wide level, rather than at the BMU level. Second, Plaintiff claims the Forest Service should have included a discussion in the cumulative effects analysis of the effects from breaches of road closures. Defendants respond that the BMU is the appropriate analysis level for cumulative effects, the NEPA documents fully analyzed the cumulative effects, and there was no need for additional analysis on road breaches.

"Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. An EIS should

include a discussion of "[w]hether the action is related to other actions with

individually insignificant but cumulatively significant impacts." 40 C.F.R. §

1508.27(b)(7); Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208,

1214 (9th Cir. 1998) (quoting Neighbors of Cuddy Mountain v. United States

Forest Service, 137 F.3d 1372, 1378 (9th Cir. 1998)). The scope and nature of the

direct, indirect, and cumulative impacts analysis is a matter committed to the

sound discretion of the agency. Kleppe v. Sierra Club, 427 U.S. 390, 413-14

(1976). If the nature and scope of the analysis is challenged, the reviewing court

may only examine whether "the agency has taken a 'hard look' at the

environmental consequences." Inland Empire Public Lands Council v. U.S. Forest

Service, 88 F.3d 754, 763 (9th Cir. 1996) (quoting Kleppe, 427 U.S. at 410 n. 21).

     The Ninth Circuit held that the Forest Service violated NEPA when

assessing cumulative impacts from road building only in the project area, rather

than assessing the effects forest-wide. Native Ecosystems Council v. Dombeck,

304 F.3d 886, 895-97 (9th Cir. 2002). In Dombeck, there were several other

planned projects that could include road building, and would "effect separate but

additive changes to the density of roads within" the forest. Id. at 897. The Circuit

concluded that, because the entire forest was the "geographic unit within which

the Forest Service chose to set forth binding road density standards in the Forest

Plan," the entire forest was also the appropriate level of analysis for cumulative

effects because there would be additive effects from the road building, even

though the projects were dispersed throughout the forest. Id.

In contrast, the Forest Service may look at a smaller area when assessing

cumulative effects, if the agency provides a justification on the record for its

chosen level of analysis. Selkirk Conservation Alliance v. Forsgren, 336 F.3d

944, 958-60 (9th Cir. 2003). In Selkirk, the Forest Service assessed the

cumulative effects of granting an easement to a lumber company by looking only

at the BMU level. The Forest Service stated it chose only to look at the BMU

because the topography, watershed separation, viewsheds, and management areas

for threatened and endangered species were separated from the additional area

plaintiffs argued the Forest Service should have considered in the cumulative

effects analysis. Id. at 958. In addition, the Forest Service expressed concern that

expanding the analysis area would arbitrarily dilute the effects of the project and

make them appear less than they actually were. Id. at 959. Because the Forest

Service had provided "articulable reasons [that] supported the agency decision" to

look only at the BMU when analyzing cumulative effects, the Forest Service

-61-

complied with NEPA.[12] Id. at 960.

Plaintiffs take the position the Forest Service must assess the cumulative effects of logging and road building at a forest-wide level. The Defendants assert the Forest Service properly examined the science and chose the BMU as the best level of analysis for the cumulative effects analysis. However, none of the documents on which the Forest Service relies discuss the proper level of analysis for a cumulative effects analysis. For example, Defendants point to the 1998 Rule Set and memoranda setting forth and discussing the 2006 interim rules, all of which state that the BMU is an appropriate analysis unit for addressing compliance with core and road density standards. See AR 1-31-024:4; AR 1-31-027; AR 1-31-30. They do not, however, speak to the appropriate analysis level for examining "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. Further, the cumulative effects discussions in the EIS's and EA themselves include no

---

[12] As Defendants note, the Ninth Circuit also discussed Dombeck and distinguished it from Selkirk. Selkirk, 336 F.3d at 959-60. However, the portion of Dombeck opinion the Selkirk court examined related not to NEPA and the cumulative effects analysis, but to the ESA and the chosen analysis level for a biological assessment on grizzly bears. See Dombeck, 304 F.3d at 900-02. In Dombeck, the Ninth Circuit found a violation of the ESA because the analysis area for the biological assessment excluded an area with high bear moralities. The Court concluded "the Management Subunit may well be a proper proxy for the project's action area, but one cannot tell this from the administrative record. An agency must provide support for its choice of analysis area and must show that it considered the relevant factors. Id. at 902.

analysis of why the Forest Service assessed cumulative effects at the BMU level, but merely conduct the BMU level cumulative effects analysis.[13] E.g. AR 1-33-001:142-43; 2-1-002:484-92; AR 3-36-001:178-79.

Unlike Selkirk, the EIS's and EA here do not include any discussion about the appropriate level of analysis for cumulative effects or why the Forest Service chose to analyze cumulative effects only by examining effects at the BMU level, rather than a larger scale. The record does not contain "articulable reasons [that] supported the agency decision" to look only at the BMU level when analyzing cumulative effects. Selkirk, 336 F.3d at 960. The NEPA documents do not reflect why the Forest Service has chosen to use the same level of analysis for cumulative effects.[14] By looking only at the BMU, it is possible there could be multiple projects going on in neighboring BMUs and the Forest Service would never assess how the various projects interact and if there are "additive changes" from all of the

---

[13] For the areas outside the recovery zone, the Forest Service seems to have limited cumulative effects analysis to the reoccurring use area, rather than a BMU, with no discussion of why that is the appropriate area for analysis. AR 3-36-001:178-79.

[14] In addition, as Plaintiff points out, the 1993 Recovery Plan instructed agencies to analyze cumulative effects "on a regional basis to avoid the cumulative effects of several well planned individual actions impacting bears from too many directions simultaneously." AR 1-31-077:62. Defendants, in their reply, discount this directive in the Recovery Plan, saying that nothing suggests that "regional level" means the entire forest. Def.'s Reply at 12. This may be so, but the NEPA analysis must include some justifiable discussion of why the "regional level" should be only the BMU and not a larger unit.

projects. Dombeck, 304 F.3d at 897. As the Circuit stated in its ESA analysis in

Dombeck, the BMU level "may well be a proper proxy for the project's action

area, but one cannot tell this from the administrative record. An agency must

provide support for its choice of analysis area and must show that it considered the

relevant factors." Id. at 902. The Forest Service did not provide any such support

for its process here.

The Plaintiff also argues the cumulative effects analysis should have

discussed breaches of road closures. Plaintiff points to the Annual Compliance

Monitoring Summary Report for the recovery zone in 2005, 2006, and 2008,

claiming these show continuous breaches of road closures that were not discussed

or disclosed in the cumulative effects analyses for the projects. E.g. AR 4-3-002;

AR 4-3-003; AR 4-3-004. Plaintiff also relies on a document from a Forest

Service employee requesting action to address repeated removal of a gate blocking

road access. AR 2-2-166. However these documents also discuss corrective

actions taken by the Forest Service to address such road issues. E.g. Id. at 1-2.

Further, the road monitoring reports show that the Forest Service adjusts its road

density figures based on actual use of roads, and the road density figures are then

part of the baseline road conditions relied upon in the NEPA analysis. E.g. 4-3-

002:6-8; AR 4-3-003:6-9; AR 4-3-004:2-6. The Forest Service acted within its

-64-

discretion when it did not include additional cumulative effects analysis for breaches of road closures. Kleppe, 427 U.S. at 413-14.

3.      Whether the Forest Service took a "hard look" at the adequacy of grizzly bear habitat standards

As a final matter Plaintiff argues the Forest Service did not take the required "hard look" at the adequacy of grizzly bear habitat standards. In particular, Plaintiff claims the Forest Service did not address the flaws of the Wakkinen study, whether the 2006 interim rules violate the 1995 Incidental Take Statement, and the lack of habitat standards outside the recovery zone.

In Cabinet Resource, this Court set aside the Final Environmental Impact Statement and Record of Decision for the Access Amendments because the EIS did not discuss the weaknesses in the Wakkinen study. Cabinet Resource Group, 465 F. Supp. 2d at 1101. On remand, the Court directed the Forest Service to take into account "the misgivings of Fish & Wildlife Service biologists over the 33/26/55 standard, the findings of other studies measuring habitat parameters in other ecosystems, and the state of grizzly bear mortality in the Cabinet-Yaak and Selkirk Recovery Zones" in discussing the relevance and flaws of the Wakkinen study. Id. The Forest Service is in the process of completing a new NEPA analysis for the Access Amendments and released a draft EIS in April 2009. AR 4-1-006.

-65-

The Forest Service continues to rely on the Wakkinen study as the best

available science in assessing the projects now before the Court. E.g. AR 1-32-

004:10; AR 2-1-713:10.  In responding to Plaintiff's insistence, the Forest Service

maintains it has conducted the analysis regarding the flaws in the Wakkinen study

required by Cabinet Resource.  However, most of the citations relied on come

from the draft EIS for the new Access Amendment.  Def.'s Br. at 28-29 (citing AR

4-1-006:50-53).  The Forest Service does not indicate where the draft Access

Amendment EIS was discussed or even referenced in the NEPA analysis for these

projects.  Defendants also reference a 2007 memo by a Forest Service biologist

discussing the Wakkinen study and whether it is the best available science in light

of the Cabinet Resource decision.  AR 1-31-029.  The 2007 memo summarizes the

methodology and findings of the Wakkinen study and concludes it is still the best

available science.  Id. at 5.  The Grizzly and Miller Biological Assessments and

EIS's reference this document, stating that it confirms the Wakkinen study is the

best available science, but the Biological Assessments and EIS's do not discuss

the contents of the 2007 memo, nor do they directly address the flaws in the

Wakkinen study.  AR 1-33-001:135; AR 1-33-055:20; AR 1-32-004:10; AR 2-1-

002:458, 461; AR 2-1-713:10.  The Forest Service also notes that it included data

on bear mortalities, one factor the Court directed the Forest service to address in

-66-

assessing the Wakkinen study. Def.'s Br. at 29. Merely including mortality data
in the record is insufficient, where there is no indication the Forest Service
examined the Wakkinen study in light of the mortality data. The Forest Service's
reference to the 2007 memo and the mortality data do not show that the agency
took a "hard look" at the weaknesses in the Wakkinen study, and the EIS's suffer
from the same deficiency as the EIS in <u>Cabinet Resource</u>. They fail to disclose
that some information "is incomplete or unavailable" or discuss "the relevance of
the incomplete or unavailable information to evaluating reasonably foreseeable
significant adverse impacts on the human environment." 40 C.F.R. §
1502.22(b)(1), (2). Without a discussion in the EIS or Biological Assessment of
the problems with the Wakkinen study, the public cannot adequately evaluate the
agency's decision-making process. "The Forest Service cannot simply rely on
Wakkinen as the best scientific information available; it must acknowledge and
discuss any flaws." <u>Cabinet Resource Group</u>, 465 F. Supp. 2d at 1100.

In passing, Plaintiff contends the Forest Service should have discussed
whether the 2006 interim rules are violating the 1995 Incidental Take Statement.
Plaintiff does not elaborate on this argument, but merely refers to its prior
arguments regarding the inadequacy of the standards. While the basis of
Plaintiff's argument here is not entirely clear, it seems Plaintiff is restating

-67-

concerns that the standards in place allow excessive road densities and displacement of bears and will result in unpermitted take. This is a substantive argument and does not reflect on whether the procedural mandates of NEPA are satisfied. See Robertson, 490 U.S. at 359.

Plaintiff argues the Forest Service violated NEPA because it did not address the lack of habitat standards outside the recovery zone, when the Forest Service acknowledges take is higher than in the recovery zone. The Forest Service responds that it considered the factors that are relevant outside the recovery zone: access management, food attractants, and livestock presence. Both the biological assessments and the EA/EIS for the Little Beaver and Miller Creek Projects demonstrate the Forest Service considered these factors. AR 2-1-713:23-25; AR 2-1-002:459-60; AR 3-6-038:6-10; AR 3-36-001: 176-179. The Plaintiffs have not identified any "relevant factors" the Forest Service failed to consider, and the record shows the agency took the required "hard look" when analyzing the impacts outside the recovery zone. Ocean Advocates, 361 F.3d at 1119.

## V. Conclusion

IT IS HEREBY ORDERED that both motions for summary judgment are GRANTED in part and DENIED in part. Plaintiff's motion (dkt #14) is GRANTED and Defendants' motion (dkt #17) is DENIED as to the ESA § 9 claim

-68-

for take outside the recovery zone (Count II), the ESA § 7 claim based on take

outside the recovery zone and helicopter logging (Count I), the NFMA claim for

failure to demonstrate compliance with the Forest Plan (Count VI), the NEPA

claim as to the analysis area for the cumulative effects (Count IV), and the NEPA

claim as to the failure to discuss the flaws in the Wakkinen study (Count III).  The

Plaintiff's motion (dkt #14) is DENIED and the Defendants' motion (dkt #17) is

GRANTED in all other respects.

IT IS FURTHER ORDERED that the Defendants are ENJOINED from

implementing the Grizzly Project, Miller Project, and Little Beaver Project, and

this matter is REMANDED to the Forest Service to address the deficiencies in the

Project analyses set forth in this opinion.

IT IS FURTHER ORDERED that the Defendants' motion to dissolve the

temporary restraining order (dkt #32) is DENIED as moot.

The Clerk of Court is directed to (1) enter judgment for Plaintiff and against

Defendants in accordance with this Order and (2) close this case.

Dated this **29** day of June, 2010.

15:56 pm

Donald W. Molloy, District Judge
United States District Court

-69-