IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES,<br><br>Plaintiff,<br><br>vs.<br><br>CHRIS SAVAGE, Supervisor of the Kootenai National Forest, et al.,<br><br>Defendants. | CV 09–160–M–DWM<br><br>ORDER |

## INTRODUCTION

Defendants the United States Forest Service, the United States Fish and Wildlife Service, and their official representatives (collectively "the agencies") move under Federal Rule of Civil Procedure 60(b)(5) to dissolve the injunction against the Miller West Fisher Project ("Miller Project"). (Doc. 112.) The agencies argue that dissolving the injunction is warranted because their Final Supplemental Environmental Impact Statement ("Final Supplemental EIS") and new Record of Decision for the Miller Project comply with this Court's remand order instructing them to address the deficiencies in the administrative record. In opposition, plaintiff Alliance for the Wild Rockies ("Alliance") argues that the agencies have failed to address a violation of Section 7 of the ESA. Alliance

1

concedes, and the administrative record supports, that the other violations have been resolved. The motion to dissolve the injunction is granted and the injunction is dissolved.

## BACKGROUND

This action commenced in 2009 when Alliance sought judicial review of the Miller Project, the Grizzly Project, and the Little Beaver Project on the Kootenai National Forest under the Administrative Procedure Act ("APA"). Alliance alleged the projects violated the Endangered Species Act ("ESA"), the National Forest Management Act ("NFMA"), and the National Environmental Policy Act ("NEPA"). On June 29, 2010, the Court granted summary judgment for Alliance on five claims applicable to the Miller Project. (Doc. 44.) Specifically, the Court held that the agencies (1) violated Section 9 of the ESA because the Miller Project would take grizzly bears beyond that permitted by the incidental take statement, (2) violated Section 7 of the ESA by concluding that unpermitted take was "not likely to adversely affect" grizzly bear and failing to substantiate their conclusion that helicopter logging was "not likely to adversely affect" grizzly bear, (3) violated NFMA by failing to show that the Miller Project was consistent with the Kootenai Forest Plan's requirement that projects be compatible with grizzly bear needs, (4) violated NEPA by failing to explain why analyzing cumulative effects at the Bear Management Unit level was proper, and (5) violated NEPA by

2

relying on the Wakkinen and Kasworm study ("Wakkinen study") to set grizzly bear habitat standards without addressing the study's flaws.

The Court enjoined all three projects and remanded the matter to the agencies to address the deficiencies in the administrative record. The injunctions against the Grizzly and Little Beaver Projects were dissolved after determinations that the agencies satisfied the remand order with respect to those projects. (Doc. 73; Doc. 94.) The agencies now move to dissolve the injunction against the Miller Project.

## LEGAL STANDARDS

### I. Rule 60(b)(5)

Federal Rule of Civil Procedure 60(b)(5) provides that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding" when, among other things, "the judgment has been satisfied, released or discharged . . . or applying it prospectively is no longer equitable." Rule 60(b)(5) codifies a court's inherent power to modify or vacate judgments when continued enforcement would be inequitable. *See Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1252 (9th Cir. 1999). The party seeking relief from a judgment must establish "a significant change either in factual conditions or in law" that warrants relief. *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk Jail*, 502 U.S. 367, 384 (1992)). "[A] court abuses its

3

discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Id.* (quoting *Agostini v. Felton*, 521 U.S. 203, 215 (1997)).

## II. APA

ESA, NEPA, and NFMA claims are reviewed under the APA, which provides that a court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

ANALYSIS

## I. ESA

### A. Section 9

The agencies violated Section 9 of the ESA because the Miller Project would have resulted in unpermitted incidental take of grizzly bear in the region known as the reoccurring use polygon.[1] Section 9 of the ESA makes it unlawful to

---

[1] The administrative record uses the terms "reoccurring use polygon," "recurring

4

"take"—meaning "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct"—an endangered species. 16 U.S.C. §§ 1538(a)(1)(b), 1532(19). Pursuant to Section 4(d) of the ESA, the Fish and Wildlife Service has extended the prohibition to the grizzly bear, a threatened species. 16 U.S.C. § 1533(d); 50 C.F.R. § 17.40(b). A federal agency is exempt from Section 9 if it complies with the conditions in a written incidental take statement from the Fish and Wildlife Service. 16 U.S.C. § 1536(b)(4), (o)(2).

The Miller Project will cause incidental take of grizzly bear in the Cabinet-Yaak grizzly bear recovery zone and in the area outside the recovery zone known as the reoccurring use polygon. In 1995 the Fish and Wildlife Service issued an incidental take statement that, as amended by the 1998 Interim Access Management Rule Set, permitted incidental take of grizzly bear inside the recovery zone. It did not permit incidental take in the reoccurring use polygon. Thus, as explained more fully in the remand order, the Miller Project's incidental take in the reoccurring use polygon violated Section 9. (Doc. 44 at 35–39.)

Since the remand order issued in 2010, the Kootenai National Forest Plan has been amended, *see* AR 11-65; AR 10-4,[2] and the Fish and Wildlife Service has issued a new incidental take statement for grizzly bear in the Cabinet-Yaak region,

---

use polygon," and "BORZ" interchangeably.

[2] Citations to the administrative record are denoted as AR [volume number]-[document number]:[PDF page number].

*see* AR 11-67:106–12. In 2011, the Forest Service adopted the Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones ("Access Amendments") to govern motorized vehicle access to grizzly bear habitat in the Kootenai National Forest. AR 11-65. The Fish and Wildlife Service issued an Incidental Take Statement for the Access Amendments ("Incidental Take Statement"). AR 11-67:106–12. The Incidental Take Statement permits incidental take of grizzly bear in the reoccurring use polygon provided that there are no permanent increases in linear miles of open road or total road above specified baselines, that potential increases in linear miles are offset with reductions at the same time as or prior to the increase, that temporary increases in linear miles comply with measures to minimize their impact, and that timber harvest activities occurring within multiple watersheds are scheduled to minimize the disturbance of grizzly bears. *Id.* at 17– 18, 111–12. In 2015, the Access Amendments were incorporated into the revised Kootenai Forest Plan. AR 10-4:19. Accordingly, the Incidental Take Statement, AR 11-67:106–12, is still operative.

As Alliance concedes, the Incidental Take Statement supports incidental take in the reoccurring use polygon, provided certain conditions are met. The administrative record shows, and Alliance does not dispute, that the Miller Project complies with those conditions. First, the Miller Project will not result in any

6

permanent increase of open or total linear road miles. AR 9-6:25. Second, because the Miller Project does not contemplate any potential permanent increases, there is no need for an offset. Third, the Miller Project's temporary increase in linear open road miles in the reoccurring use polygon complies with the Incidental Take Statement, which allows temporary roads in the reoccurring use polygon to open to the public for the remainder of the summer after harvest activities are complete. *Id.* at 25, 41; AR 11-67:18. Finally, timber harvests in the reoccurring use polygon will be scheduled to minimize the disturbance of sensitive species, including grizzly bear. AR 9-6:26–27, 32, 82, 93, 148–49, 155. The Incidental Take Statement, then, exempts the Miller Project from Section 9 and cures the violation identified in the remand order.

**B.  Section 7**

The agencies violated Section 7 of the ESA in two ways: (1) by concluding that unpermitted take was "not likely to adversely affect" grizzly bears and (2) by failing to substantiate their conclusion that helicopter logging was "not likely to adversely affect" grizzly bears. Section 7 of the ESA requires federal agencies, in consultation with the Fish and Wildlife Service or the National Marine Fisheries Service, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification"

7

of critical habitat. 16 U.S.C. § 1536(a)(2). Section 7 consultation is required when a federal agency determines that its action "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a). The consultation may be informal when the agency determines that its action "may affect" but is "not likely to adversely affect" a listed species and the Fish and Wildlife Service or the National Marine Fisheries Service concurs in writing. 50 C.F.R §§ 402.14(b)(1), 402.12(k)(1).

Formal consultation is required when the agency determines that its action is "likely to adversely affect" a listed species. 50 C.F.R. § 402.14(a). At the end of formal consultation, the Fish and Wildlife Service or the National Marine Fisheries Service issues a biological opinion as to whether the action is likely to jeopardize a listed species or its critical habitat. 50 C.F.R. § 402.14(h). A biological opinion that concludes an action is likely to jeopardize a listed species or critical habitat must include reasonable and prudent alternatives to avoid the jeopardy. *Id.* If necessary, an incidental take statement will also be issued. 50 C.F.R. § 402.14(i).

### 1. Incidental Take Statement

The Miller Project's unpermitted take in the reoccurring use polygon that formed the basis of the Section 9 violation also formed the basis of the first Section 7 violation. As explained more fully in the remand order, the agencies' determination that the Miller Project "was not likely to adversely affect" grizzly bears violated Section 7 because unpermitted incidental take is an adverse effect.

8

(Doc. 44 at 41.) As described above, the Incidental Take Statement issued for the Access Amendments permits incidental take of grizzly bears in the reoccurring use polygon. Because the Miller Project no longer involves unpermitted take, the first Section 7 violation identified in the remand order has been cured.

Alliance contends that according to the Fish and Wildlife Service's ESA Section 7 Handbook, even permitted incidental take is an adverse effect that compels an is "likely to adversely affect" determination. Alliance further argues that the agencies should have analyzed the incidental take in their supplemental analysis of the Miller Project on remand. Alliance's argument fails to appreciate the relationship between the Access Amendments and the Miller Project.

Before adopting the Access Amendments in 2011, the Forest Service concluded that they were "likely to adversely affect" grizzly bears and initiated formal Section 7 consultation with the Fish and Wildlife Service. AR 11-66:3. The formal consultation resulted in the Biological Opinion and Incidental Take Statement for the Access Amendments, discussed above. AR 11-67. The Biological Opinion concluded that the Access Amendments are not likely to jeopardize grizzly bears. AR 11-67:101.

The Biological Opinion also established the baseline conditions for grizzly bears in the Cabinet-Yaak Ecosystem, inside the recovery zone and in the reoccurring use polygon. AR 10-2:1–2. Whether subsequent agency action

9

adversely affects grizzly bears is measured against those baseline conditions.

AR 10-2:2. The Fish and Wildlife Service described this as a "tiered consultation framework," explaining that

> The biological opinion has been identified as the first-tier of a tiered consultation framework, with the review of subsequent projects related to access management that may affect grizzly bears as being the second-tier of consultation. Second-tier biological opinions would be issued as appropriate, where proposed actions would result in adverse effects to grizzly bears *that were not fully analyzed in the first-tier biological opinion*.

AR 10-2:2 (emphasis added); *see also Gifford Pinchot Task Force v. Fish & Wildlife Serv.*, 378 F.3d 1059, 1067–68 (9th Cir.) (approving "programmatic environmental analysis supplemented by later project-specific environmental analysis" in the context of Section 7 consultation), *amended on other grounds by* 387 F.3d 968 (2004).

The supplemental analysis of the Miller Project on remand occurred after the Access Amendments and therefore at the "second tier" of the consultation framework. That the Miller Project is "not likely to adversely affect" grizzly bears means that it will not result in adverse effects beyond those already analyzed at the "first tier" in the Biological Opinion and Incidental Take Statement. Indeed, in its concurrence to the Miller Project's "not likely to adversely affect" determination, the Fish and Wildlife Service explained that "the proposed action is not likely to adversely affect the threatened grizzly bear *in ways other than described in the*

10

*2011 consultation on the Access Amendment.*" AR 10-2:3 (emphasis added). The incidental take resulted in a "likely to adversely affect" determination and was fully analyzed at the first tier. Contrary to Alliance's contention, that analysis did not need to be repeated and the Miller Project's "not likely to adversely affect determination" is proper at the second tier.

### 2. Elimination of Helicopter Logging

The Miller Project originally called for helicopter logging. As explained more fully in the remand order, the agencies failed to substantiate their determination that the helicopter logging was "not likely to adversely affect" grizzly bears. (Doc. 44 at 47–50.) The agencies have since eliminated helicopter logging from the Miller Project. AR 7A-1:14; AR 9-6:12–13, 26. As Alliance concedes, the elimination of helicopter logging cures the second Section 7 violation identified in the remand order.

## II. NFMA

The agencies violated NFMA by failing to show that the Miller Project complied with the Kootenai National Forest Plan's standard for grizzly bear needs on Management Situation 1 lands. NFMA requires the Forest Service to develop a forest plan for each national forest. 16 U.S.C. § 1604(a). Subsequent projects within a national forest must be consistent with the forest plan. 16 U.S.C. § 1604(i). At the time of the remand order, the 1987 Kootenai Forest Plan was the

governing plan. It required decisions on lands designated "Management Situation 1," which includes most of the Miller Project, to "favor the needs of the grizzly bear when grizzly habitat and other land use values compete" and provided that "[l]and uses which can affect grizzlies and/or their habitat will be made compatible with grizzly needs or such uses will be disallowed or eliminated." AR 2-270:91. As explained more fully in the remand order, the Miller Project analysis did not explicitly address the standard for Management Situation 1 lands and the record was unclear as to whether the standard was met. (Doc. 44 at 54–58.)

Since the remand order issued, the 1987 Kootenai Forest Plan has been replaced by the 2015 Kootenai Forest Plan. AR 10-4. The 2015 Plan includes the same standard for Management Situation 1 lands as the 1987 Plan. *See* AR 9-6:30. The agencies have explicitly addressed this standard and explained how the Miller Project meets it in their Final Supplemental EIS. AR 9-6:30–33. Indeed, as Alliance concedes, the Final Supplemental EIS's analysis is substantially similar to the analysis that the Court determined was sufficient to resolve the same NFMA violation with respect to the Grizzly Project. The Final Supplemental EIS's analysis of the Miller Project and the Forest Plan cures the NFMA violation identified in the remand order.

## III. NEPA

### A. Bear Management Units

The agencies originally violated NEPA by failing to explain why analyzing cumulative effects at the Bear Management Unit level was proper. NEPA requires all federal agencies to prepare an EIS for major actions that significantly affect the quality of the human environment. 42 U.S.C. § 4332(C). The EIS must analyze the cumulative effect of the proposed action, meaning the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. §§ 1508.25(c), 1508.7. An agency has discretion to choose the geographic scope of its cumulative effects analysis, but the record must support the agency's choice. *See Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 958–60 (9th Cir. 2003).

The agencies analyzed the Miller Project's cumulative effects at the Bear Management Unit level, but, as explained more fully in the remand order, the agencies never discussed why the Bear Management Unit is the proper level of analysis. (Doc. 44 at 62–65.) The agencies have since explained their use of the Bear Management Unit for the cumulative effects analysis in the Final Supplemental EIS. AR 9-6:16–18. As Alliance concedes, the Final Supplemental EIS's explanation of the cumulative effects analysis is substantially similar to the analysis that the Court determined was sufficient to resolve the same NEPA

violation with respect to the Grizzly Project. The Final Supplemental EIS cures the first NEPA violation identified in the remand order.

### B. Wakkinen Study

The agencies originally violated NEPA by relying on the Wakkinen study to set grizzly bear habitat standards without addressing the study's flaws. NEPA requires agencies to "take a 'hard look' at the environmental effects of their planned action." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989). It "places upon an agency the obligation to consider every significant aspect of the environmental impact of the proposed action" and "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983) (citations omitted). Further, an agency must disclose when relevant information is "incomplete or unavailable." 40 C.F.R. § 1502.22.

The Wakkinen study is a peer-reviewed study of local bear populations in the Selkirk and Cabinet-Yaak Ecosystems. The agencies relied on the Wakkinen study as the best available science regarding the management of grizzly bear habitat in relation to motorized routes in the Selkirk and Cabinet-Yaak Ecosystems. As explained more fully in the remand order, the agencies violated NEPA by failing to take a "hard look" at the Wakkinen study's flaws because "[w]ithout a discussion in the EIS or Biological Assessment of the problems with

the Wakkinen study, the public cannot adequately evaluate the agency's decision-making process." (Doc. 44 at 67.)

The agencies have since addressed the limitations of the Wakkinen study in Appendix C to the Final Supplemental EIS. As Alliance concedes, the Final Supplemental EIS's analysis of the Wakkinen study is substantially similar to, if not the same as, the analysis that the Court determined was sufficient to resolve the same NEPA violation with respect to the Grizzly Project. The Final Supplemental EIS cures the second NEPA violation identified in the remand order.

## CONCLUSION

The supplemental analysis completed by the agencies on remand brings the Miller Project into compliance with the ESA, NFMA, and NEPA. Accordingly, the June 2010 Judgment has been satisfied and it is inequitable for the injunction to remain in place.

IT IS ORDERED that the agencies' motion to dissolve the injunction against the Miller Project (Doc. 112) is GRANTED, and the injunction is dissolved.

DATED this 15th day of November, 2018.

13:37 P.M.

Donald W. Molloy, District Judge
United States District Court